UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JUAN PABLO RUIZ OLIVA,<br><br>                              Petitioner,<br><br>v.<br><br>LIDIA ESPINOZA ESPINOZA,<br><br>                              Respondent. | Case No.: 20cv1133-JAH-DEB<br><br>**ORDER DENYING PETITION FOR RELIEF SEEKING ORDER OF IMMEDIATE RETURN OF A MINOR UNDER THE HAGUE CONVENTION [Doc. No. 1]** |

      Pending before the Court is Petitioner Juan Pablo Ruiz Oliva's ("Petitioner") Verified Petition for Relief Seeking an Order of Immediate Return of a Minor Under The Hague Convention On The Civil Aspects Of International Child Abduction ("Petition," ECF No. 1).  Respondent Lidia Espinoza Espinoza ("Respondent") filed an Answer ("Answer," ECF No. 5).  After ordering expedited pre-trial proceedings, the Court held a two-day bench trial on whether Respondent is wrongfully retaining minor child, P.E., in the United States.

      For the reasons set forth, the Court finds that it lacks jurisdiction to grant the requested relief.  Accordingly, the Petition for Relief Seeking an Order of Immediate Return Mexico is **DENIED**.

///
///
///
///

## BACKGROUND

Petitioner filed a Verified Petition under the International Child Abduction Remedies Act ("ICARA"), 22 U.S.C. § 9001, et seq., seeking the return of his minor child, P.E., to Mexico. *See* Petition. Petitioner argues the Court has concurrent original jurisdiction pursuant to 22 U.S.C. § 9003(a) to "determine the rights according to the Convention without having to address the merits of any underlying child custody claim." *Id*. at 2. Petitioner asserts he is a habitual resident of Mexico City and alleges Respondent wrongfully removed and retained P.E. in the United States. *Id*. Petitioner requests that the Court order P.E. returned to Mexico, his country of habitual residence. *Id*. at 5.

Respondent filed an Answer arguing the Court does not have subject matter jurisdiction pursuant to 22 U.S.C. § 9001 et seq., 28 USC 1376(a), or 28 U.S.C. § 1331 because Petitioner cannot establish wrongful removal or retention of P.E. as defined by the Treaty. Answer at 2. Respondent further asserts that Petitioner has not continually remained a habitual resident of Mexico City because both Respondent and Petitioner moved to the United States with the intent to settle and raise P.E. therein. *Id*. As such, Respondent claims P.E.'s relocation from Mexico to the United States was neither illegal nor wrongful pursuant to the Treaty or ICARA, warranting dismissal of the Petition. *Id*. at 5.

A bench trial was subsequently held, and the Court took the matter under submission. ECF. Nos. 16-17.

## FINDINGS OF FACT

At trial, Petitioner called the following witnesses: Ms. Espinoza and Mr. Oliva. Respondent called the following witnesses: Jeffrey Edelson, Professor of Social Welfare at University of California Berkeley, expert witness on social science; Maria Espinoza Espinoza, respondent's sister; Manuel Nunez, respondent's brother-in-law; Ms. Espinoza; and Mr. Oliva.

Based on the testimony and documentary evidence presented during the bench trial, this Court makes the following findings of fact as to whether P.E. was wrongfully removed from his country of habitual residence, or whether any valid exception applies.

Petitioner and Respondent were born in Mexico and are both citizens of the Republic of Mexico. Oct. 20 Tr. at 20, 74. Both Petitioner and Respondent have family members residing in Mexico City. *Id*. at 24. Respondent was raised in Hidalgo, Mexico, and lived with Petitioner in Mexico City, where their child P.E. was born on August 15, 2016. Oct. 20 Tr. at 20, 23, 75. P.E. resided with Petitioner and Respondent from 2016 to 2019, and both parents exercised their parental rights. Oct. 20 Tr. at 24, 74.

Petitioner and Respondent met in 2015 in Mexico City and the pair began living together as a couple at the beginning of November 2015. Oct. 20 Tr. at 23; Oct. 21 Tr. at 240. Respondent testified the relationship continued amicably until Respondent advised Petitioner she may be pregnant. Oct. 21 Tr. at 240-41. Upon hearing this, Respondent alleges Petitioner would not allow her to leave their Mexico City residence and initially refused to take her to the doctor. *Id*. Once Respondent confirmed she was pregnant, Petitioner denied the child was his own. *Id*. at 242. Respondent alleges Petitioner did not want to pay the medical expenses for the delivery of the child and suggested twice that Respondent have an abortion. *Id*. at 243. Respondent also testified that Petitioner stated he would not recognize the child as his own by giving the child his surname. *Id*. at 244. Respondent alleges that on one occasion during her pregnancy, Petitioner shoved, kicked, and hit Respondent, resulting in a one and one-half week hospitalization. *Id*. No proof has been proffered as to this hospitalization.

During her pregnancy and between the birth of the child and October 19, 2019, Respondent testified that Petitioner exercised control over her through physical and emotional abuse. Oct. 21 Tr. at 244-45. Maria Espinoza Espinoza's testimony supported

this allegation.[1] Specifically, Maria Espinoza Espinoza testified Respondent feared Petitioner, as he would make threats stating that Respondent's family would be killed or harmed if she tried to leave him. *Id*. at 198-99, 201. After one incident in December 2016, Respondent reported to the police in Mexico that Petitioner had been abusive against her. Oct. 20 Tr. at 64-65. However, no charges were brought against Petitioner and Respondent did not see a physician for any injuries. *Id*.

Petitioner and Respondent lived together at Respondent's sister's house in Mexico City for approximately one year before deciding they were moving to the United States. Oct. 21 Tr. at 164, 166. Maria Espinoza Espinoza testified that Petitioner explained to her that he and Respondent were moving to the United States because he was getting older and was not accomplishing anything in Mexico. *Id*. at 166. At the time of this decision, Petitioner had secured a B1/B2 tourist Visa for entry into the United States, but Respondent and P.E. had not. Oct. 21 Tr. at 214. According to Respondent, Petitioner advised her to state to immigration authorities that the purpose of their visit to the United States was to bring their child to Disneyland, otherwise the tourist visa would not be issued. *Id*.

During trial, Petitioner presented evidence of travel agency contacts, and testified that he prepared for their trip by contacting a travel agency to inquire about Disneyland prices so he could plan a trip that would be within their budget. Oct. 20 Tr. at 76. Petitioner states the family decided to go to Disneyland in Anaheim, California, to celebrate both P.E.'s and Respondent's August birthdays and return to Mexico in January 2020. *Id*. However, no return airline tickets were purchased before entering the United States. Oct 20 Tr. at 86.

---

[1] On cross-examination, Petitioner's attorney elicited testimony from Maria Espinoza Espinoza to utilize her 2004 criminal conviction in Mexico for impeachment purposes under Federal Rule of Evidence 609. *See* Oct. 21 Tr. at 180-86. However, as the conviction was more than ten years old at the time of the testimony, the Court found this evidence inadmissible, and the probative value of the conviction did not substantially outweigh its prejudicial effect. Fed. R. Civ. Pro. 609(b)(1).

Respondent stated that in preparation to leave Mexico City, Petitioner utilized and withdrew all monies contained in her bank account and their son's savings account to support their visa application and to cover expenses for the move to United States. Oct. 21 Tr. at 216. In addition, Respondent alleges Petitioner sold family possessions in preparation for their move. *Id*. at 217. Respondent further alleges Petitioner did not want her to speak to family and friends about their trip to United States, but she did so anyway because she knew she would not be returning to Mexico. *Id*.

On October 19, 2019, Petitioner, Respondent, and P.E. entered the United States. Oct. 20 Tr. at 32. Upon arrival at the Port of Entry, they were interviewed by an immigration officer, and Petitioner stated that the family was entering the United States on a vacation to visit with family in San Diego. *Id*. Respondent's brother-in-law, Manuel Nunez, testified that he met Petitioner, Respondent, and P.E. on the United States' side of the Port of Entry to transport them to his home. Oct. 21 Tr. at 205-06. According to Manuel Nunez, Petitioner told him that he intended to look for a job and an apartment in the United States to stay in the United States. *Id*. at 206. Mr. Nunez testified that while Petitioner and Respondent stayed at his home after their arrival, he observed Petitioner was controlling and verbally abusive toward Respondent in their relationship. *Id*. at 207-08.

According to Respondent, Petitioner applied for employment at different places shortly after their arrival to the United States. Oct. 21 Tr. at 218. On or about October 22, 2019, Petitioner obtained a position as a landscaper. Oct. 21 Tr. at 218-19. Petitioner asserts that he merely rode with Respondent's cousin to his construction work site to see what a day on the job was like. Oct. 20 Tr. at 88. However, in later testimony Petitioner admits that he began working in the United States in order to pay for his expenses and request help to return to Mexico. *Id*. at 90. Respondent also obtained work shortly thereafter at a bakery. Oct. 21 Tr. at 218.

According to Respondent, once both Petitioner and Respondent began working, they sought to hire a caregiver to help with P.E. when their work shifts overlapped. Oct. 21 Tr. at 220-21. Respondent testified that Petitioner suggested enrolling P.E. in school because

1  Petitioner believed at his age he needed to be in school and enrolling him in school meant
2  they could avoid paying for childcare. *Id*. at 220. Respondent applied to enroll P.E. in
3  school, which required a medical check-up before considering the application. *Id*.
4  Respondent testifies that Petitioner knew of the effort to enroll the child in school and gave
5  her money to pay for the medical check-up to meet this requirement. *Id*.

6  Respondent further testified that during this time of establishing their employment
7  and school for P.E. in the United States, Petitioner was eager to move out of Respondent's
8  sister's home and obtain an apartment or home of their own. Oct. 21 Tr. at 221. Notably,
9  Respondent testified that once in the United States, there were no discussions, plans or
10 preparations to visit Disneyland. *Id*. at 214. The pair did not look for hotel reservations at
11 Disneyland or near Disneyland, did not consider any plans to rent a car, and did not make
12 any other effort to visit Disneyland. *Id*.

13 Respondent testified that on October 23, 2019, the couple had an argument during
14 which Petitioner stated he was going back to Mexico and that he was taking his son with
15 him. Oct. 21 Tr. at 223. Respondent also alleges Petitioner told her that he would go to
16 the immigration service and call the police and Respondent would be forced to go back to
17 Mexico. *Id*. Prior to this argument, Petitioner did not discuss any plans to return to Mexico.
18 *Id*. at 227.
19 ///
20 ///
21 ///
22 ///
23 ///
24 ///
25 ///
26 ///
27 ///
28

     Despite the argument and subsequent break up, Petitioner and Respondent continued to live together until November 11 or 12th, 2019, at Respondent's sister's home. Oct. 21 Tr. at 228, 232.[2] During this period, Respondent alleges she was raped by Petitioner numerous times in the presence of P.E. Oct. 21 Tr. at 250. After witnessing the battery, Respondent alleges P.E. would mimic the sexual assault activity he witnessed. *Id.* at 251-52. Respondent further alleges that P.E. would console her and attempt to protect her from Petitioner when witnessing an argument between his parents. *Id.* Respondent did not report abuse to state law enforcement authorities, testifying she was afraid Petitioner would follow through on his threats that he or his contacts in Mexico would kill her and her family in Mexico. *Id.* at 266, 275. Petitioner did not address the allegations of abusive physical or verbal conduct and sexual assaults.

     On or about November 11, 2019, Petitioner moved out of Respondent's sister's home. Oct. 21 Tr. 232. Respondent alleges she and Petitioner entered into a written agreement to allow Petitioner to visit with P.E. on weekends. *Id.* at 232-33. The agreement also included financial arrangements wherein Petitioner agreed to pay Respondent $100 per month to assist in the care of the child. *Id.* at 235. This amount was to assist Respondent with housing, school, food, clothing, and medical expenses. *Id.*

---

[2] Respondent's testimony attempts to depict Petitioner as not exercising his parental custody during this period. *See e.g.*, Oct. 21 Tr. at 228 (testifying that Petitioner spent very little time with P.E. after returning home from work); Oct. 21 Tr. at 253 (testifying that Petitioner never assisted Respondent with any element of childcare, whether changing diapers or assisting with bathing the child); Oct. 21 Tr. at 233 (testifying that after moving out of the family home, Petitioner would pick P.E. up for the next three or four weekends, but Petitioner would often take P.E. to parties with his friends and would spend very little time with him). This Court will not engage in a determination of the quality in which Petitioner exercised his custody rights—a fact Respondent's testimony supports. *Asvesta v. Petroutsas*, 580 F.3d 1000, 1018 (9th Cir. 2009) ("Once [the court] determines that the parent exercised custody rights in any manner, the court should stop—completely avoiding the question whether the parent exercised the custody rights well or badly.").

Petitioner picked up P.E. for the next three or four weekends pursuant to the agreement. Oct. 21 Tr. at 233. Respondent learned that Petitioner would often take P.E. to parties with his friends and would spend very little time with him. *Id*. Respondent states she became concerned because she had no telephone number or physical address for Petitioner. *Id*. at 234. Upon obtaining this information, Respondent placed restrictions upon the visitation, asking that Petitioner spend time by himself with P.E. and that he does not expose P.E. to other people during visitation. *Id*. at 233.

On December 25, 2019, Respondent states she asked for a copy of the written agreement that the pair had entered weeks earlier, but Petitioner refused. Oct. 21 Tr. at 236. Respondent then asked Petitioner to enter into a legal custody agreement, but Petitioner again refused because he did not want to lose the travel visa. *Id*. Petitioner last spoke to his son on this date. Oct. 20 Tr. at 94.

After the December encounter, Petitioner contacted the police saying his wife and child had disappeared. Oct. 20 Tr. at 97; Oct. 21 Tr. at 238. Upon responding and speaking with both Respondent and P.E., the police suggested Respondent file a restraining order. Oct. 21 Tr. at 238. Petitioner also contacted the immigration service by email,[3] alleging Respondent had a plan to remain in California and had obtained a false green card to gain employment here. *See* Respondent's Exhibit 12, Doc. No. 15-12. Respondent was thereafter detained by Immigration and Customs Enforcement (ICE). Oct. 20 Tr. at 97;

---

[3] Petitioner sent an email to United States Department of Homeland Security, Enforcement and Removal Operations (ERO) dated January 1, 2020, stating:
> "We entered as tourists on October 19, 2019 and my wife Lidia Espinoza born on [redacted] had a plan to stay to live in San Marcos California [*sic*], at the following address [redacted] San Marcos CA [*sic*] with her sister Maribel Espinoza. My wife's sister helped her get a false green card to be able to start working in the restaurant Denny's as a dishwasher. That same sister also helped my wife apply for a school for my son, [redacted]. That is why I am contacting you, because I am in total disagreement [*sic*]"

Oct. 21 Tr. at 239. Immigration proceedings are currently pending as to Respondent. Oct. 20 Tr. at 21.

On January 17, 2020, Respondent filed a request for a domestic violence restraining order ("DVRO") in the Superior Court of California against Petitioner, stating in the application that she wished to implement a child custody and visitation order. *See* Respondent's Exhibit 14, ECF No. 15-14. The DVRO was temporarily granted until the hearing scheduled for February 4, 2020. *Id*. The petition was dismissed at the February 4 hearing. *See* Petitioner's Exhibit 2, ECF No. 12-2. Petitioner alleges the petition was dismissed because Respondent failed to present any evidence. Oct. 20 Tr. at 82.

On February 6, 2020, Respondent filed a petition in family law court in Vista, California. *See* Respondent's Exhibit 15, ECF No. 15-15. In the petition, Respondent requested full custody of P.E. but also asked for parenting classes and reasonable supervised visitations with Petitioner. *See* Respondent's Exhibit 16, ECF No. 15-16; *see also* Oct. 21 Tr. at 240. The petition for custody was not granted. Oct. 20 Tr. at 47. Petitioner last observed his son at school in February 2020. Oct. 20 Tr. at 41. Respondent alleges that after being served with the petition for custody, Petitioner returned to Mexico. Oct. 21 Tr. at 240.

## **CONCLUSIONS OF LAW**

The Hague Convention[4] on the Civil Aspects of International Child Abduction (the "Hague Convention") requires that when a child under the age of sixteen has been wrongfully removed or retained from his country of habitual residence, the court must generally order the return of the child unless certain exceptions apply. The Hague

---

[4] The Hague Convention mandates the return of children between signatory states only. *See Ruiz v. Tenorio*, 392 F.3d 1247, 1250 (11th Cir. 2004). Mexico and the United States are both signatories. U.S. Dep't of State, U.S. Hague Convention Treaty Partners https://travel.state.gov/content/travel/en/International-Parental-Child-Abduction/abductions/hague-abduction-country-list.html (last visited August 9, 2020).

Convention "was adopted in 1980 in response to the problem of international child abductions during domestic disputes [and] ... seeks to secure the prompt return of children wrongfully removed to or retained in any Contracting State." *Abbott v. Abbott*, 560 U.S. 1, 8 (2010) (quotation omitted). "The Convention's central operating feature is the return remedy." *Id.* (quotation omitted).

However, "the Hague Convention analysis is not a determination of custody rights[, rather,] a United States district court has authority to determine the merits of an abduction claim, but not the merits of the underlying custody claim." *Shalit v. Coppe*, 182 F.3d 1124, 1128 (9th Cir. 1999).[5] "With a few narrow exceptions, the court must return the abducted child to its country of habitual residence so that the courts of *that* country can determine custody." *Cuellar v. Joyce*, 596 F.3d 505, 508 (9th Cir. 2010). A petitioner seeking return of a child under the Convention must prove by a preponderance of the evidence that the child "was wrongfully removed or retained within the meaning of the Convention." *See* 42 U.S.C. § 9003(e)(1)(A). A removal or retention is "wrongful" if the child was removed from the child's habitual residence in violation of the parent's "rights of custody" and the parent was actually exercising those rights at the time of the removal or retention. *Abbott*, 560 U.S. at 8–9.

As an initial matter, the Court must determine when the alleged wrongful removal or retention occurred. The Convention frames the relevant time frame for "habitual residence" as "immediately before" the wrongful removal or retention. Hague Convention, art. 3. When one parent consents to the child staying with another, and that other person later refuses to return the child, the date of retention is that point when the noncustodial parent knows the custodial parent will not return the child. *See Zuker v. Andrews*, 2 F.Supp.2d 134, 139 (D. Ma. 1998) (retention occurred when custodial parent clearly communicated her intention of not returning the child to the noncustodial parent); *see also*

---

[5] Unless otherwise noted, internal quotation marks, ellipses, brackets, citations, and footnotes are omitted from citations.

*Mozes*, supra n.3, 239 F.3d at 1070–71 (date of retention is clearly the date the mother initiated custody proceedings, even though this date was prior to the end of the agreed-upon stay abroad). Petitioner and Respondent both willingly traveled to the United States with P.E. on October 19, 2019. The retention became allegedly wrongful sometime after the December encounter, when Petitioner contacted the police to report his wife and son disappeared, and when he emailed ERO. *Blackledge v Blackledge*, 866 F.3d 169, 179 (3d Cir. 2017) ("[W]e hold that the retention date is the date beyond which the noncustodial parent no longer consents to the child's continued habitation with the custodial parent and instead seeks to reassert custody rights, as clearly and unequivocally communicated through words, actions, or some combination thereof.").

### 1. Habitual Residence[6]

The most important inquiry under the Convention is the state of the child's habitual residence. *Asvesta v. Petroutsas*, 580 F.3d 1000, 1017 (9th Cir. 2009). Determining a child's habitual residence is a mixed question of law and fact. *Monasky v Taglieri*, 140 S. Ct. 719, 730 (2020). Neither the Hague Convention nor ICARA defines the term "habitual residence," however, an actual agreement is not required. *Id.* at 728. Interpreting the statute's plain language, the Supreme Court explained that "[a] child 'resides' where [he] lives," and that a residence is habitual only when it is "more than transitory," which is a fact specific inquiry. *Id.* Further, the Supreme Court stated that the Convention's

---

[6] Although the Ninth Circuit has created a four-step inquiry to determine whether a wrongful retention or removal occurred in *Mozes v Mozes*, 239 F.3d 1067, 1070 (9th Cir. 2001), in its recent opinion in *Monasky v. Taglieri*, the United States Supreme Court held that "a child's habitual residence depends on the totality of the circumstances specific to the case." *Monasky*, 140 S. Ct. at 723. Thus, "a wide range of facts other than an actual agreement, including facts indicating that the parents have made their home in a particular place, can enable a trier to determine whether an infant's residence in that place has the quality of being 'habitual.'" *Id.* at 729. Accordingly, this Court applies a totality of circumstances standard to determine P.E.'s habitual residence.

explanatory report and the treaty's negotiation and drafting history also confirm a fact-based approach and that for a residence to be habitual, "some degree of integration by the child in a social and family environment" is required. *Id*. Overall, the place "where a child is at home, at the time of removal or retention," is the child's habitual residence. *Id*.

"Because children, especially those too young or otherwise unable to acclimate, depend on their parents as caregivers, the intentions and circumstances of caregiving parents are relevant considerations. No single fact, however, is dispositive across all cases." *Monasky*, 140 S. Ct. at 727. Because parents often dispute their intentions during litigation, "the court should look at actions as well as declarations in determining whether the parents shared an intent to abandon a prior habitual residence." *Walker v. Walker*, 701 F.3d 1110, 1119 (7th Cir. 2012).

P.E. was three years old at the time of the wrongful retention and is now five years old. The testimony set forth shows that P.E. is living with family and is enrolled in school. No other evidence was proffered as to P.E.'s living arrangements, schooling, or any other information as to his social integration in the United States. However, considering P.E.'s age, his level of familial and social integration demonstrates sufficient settlement into his community in the United States. *See Feder v. Evans-Feder*, 63 F.3d 217, 224 (3d Cir. 1995) (finding that Australia was a four-year-old child's habitual residence because for six months he "attended preschool and was enrolled in kindergarten for the upcoming year, participating in one of the most central activities in a child's life").

Petitioner and Respondent's actions are more illuminating of their intentions to abandon Mexico as their habitual residence: they sold furniture from their Mexico home, told family and friends they were moving, and booked only one-way flights with no settled plans to return to Mexico. Once in the United States, they enrolled P.E. in school and, importantly, both parties obtained work. Taken together, these actions suggest a settled intent on the part of the family to take up habitual residence in the United States, as opposed to a sabbatical or conditional stay. *See Holder v. Holder*, 392 F.3d 1009, 1018 (9th Cir.

2004) (noting sabbaticals and other conditional stays are not sufficient to abandon a prior habitual residence).

Petitioner attempts to argue that their entry on an H1/B1 visa as visitors to the United States weighs against finding a parental intent to establish residency in the United States. While this fact carries some weight, it is not dispositive in light of the other facts.[7]

All of the facts taken together indicate Petitioner and Respondent, with P.E., intended to make the United States their habitual residence. *See Monasky*, 140 S. Ct. at 729.[8]

---

[7] Immigration-related consequences resulting from the parties' actions are not for this Court to decide. The Court notes that in general, Respondent's immigration status is only considered insofar as it bears on P.E.'s practical well-being. Petitioner has not put forth any evidence to suggest that P.E. is negatively harmed by his immigration status.

[8] Respondent raises the grave risk exception, which provides that the Court "is not bound to order the return of the child if . . . there is a grave risk that his or her return would expose the child to physical or psychological harm or otherwise place the child in an intolerable situation." *Cueller v. Joyce*, 596 F.3d 505, 508 (9th Cir. 2010). The party raising this exception has the burden of proving by clear and convincing evidence that returning the child to his habitual residence would expose him to physical or psychological harm or otherwise place him in an intolerable situation. *Id.* at 509. In evaluating the applicability to this exception, the Court must determine whether the risk to the child is grave, not merely serious. *Gaudin v. Remis*, 415 F.3d 1028, 1036 (9th Cir. 2005). Respondent claims that Petitioner sexually and physically battered her, at times in the presence of P.E. *See* ECF Nos. 15-14, "January 17, 2020 Temporary Restraining Order"; 15-4, "December 2016 Domestic Violence Report (City of Mexico, Federal District)." Because the Court ultimately finds that P.E. is a habitual resident of the United States, this Court will not determine the credibility of Respondent's claims against Petitioner. However, the Court notes that physical abuse or threats towards a spouse are not the same as physical abuse or threats towards a child. *See Nunez Escudero v. Tice-Menley*, 58 F.3d 374, 375-78 (8th Cir. 1995). To qualify as a grave risk of psychological harm under the Convention, the risk must be to P.E. To support this claim, Professor Jeffrey Edelson testified that research shows adult-to-adult domestic violence in homes with young children disrupts three major "stepping stones" to development for such young children: (1) the ability to develop secure attachments with parents or caregivers, which are the foundation on which later social relationships are built; (2) the ability to self-regulate, i.e., the ability to modulate their own

No further analysis is required for the Court to conclude that Petitioner has failed to meet his burden of showing that P.E. was wrongfully retained.

## CONCLUSION AND ORDER

Based on the Court's finding that P.E.'s habitual residence is the United States, Petitioner has not made the showing required under the Hague Convention for a mandatory return of P.E. to Mexico. Accordingly, the Petition is **DENIED**.

**IT IS SO ORDERED.**

DATED:   October 5, 2021

_____
JOHN A. HOUSTON
UNITED STATES DISTRICT JUDGE

---

behavior as they get older; and (3) the ability to learn healthy social relationships, which may first impact their interactions with other children, and later with their adult peers. *See* Oct. 20 Tr. at 117-18. Professor Edelson also indicated exposed children may develop sleeping and eating disorders; perform more poorly academically than other children not exposed to domestic violence; and develop into bullies and intimate partner abusers themselves. *Id*. at 118. While these negative psychological ramifications are serious, it is also merely theoretical as applied to P.E. Respondent's evidence and testimony only tenuously supports the application of this exception, at best, much less does she meet the requisite standard by clear and convincing evidence.